The case this afternoon is Norris v. Mason. That's case number 4110063. For the appellant we have Matthew Cate and for the appellate, Jennifer Ashford. Please proceed. May it please the court, counsel. I'm here today on behalf of Robert Mason. And just briefly, Robert Mason and Kelly Norris had a child. They had a child, a beautiful child named Maya. She was born October 10, 2003. And she's a well-adjusted little girl who was raised, the majority, by Kelly. And my client would be the first to acknowledge that she's done a great job in raising that child. He would also, at the very same time, acknowledge that he was not a participant in her life, at her birth or early on, even until the last few years. That decision at the time, there was testimony at the trial court level that he was doing it on the basis of not wanting to screw with the family unit involved that Kelly had at the time. Looking back on it, he obviously stated he regretted that. He should have done that. And that's what happened. A few years ago he decided to become more involved. They weren't able to resolve things together amicably on how much of visitation time he'd be able to have with Maya. And ultimately, had to come back to the court, the Salem County Circuit Court, to try to get more visitation time. Knowing full well that the retort to that is going to be a motion to modify his or increase his child support. But he obviously still wanted to proceed, and that's what ultimately the decision of the underlying trial court brings us here today. Two issues on appeal from Robert. The visitation schedule set up in the summer was an abuse of discretion by the trial court, as was the failure to deviate in its manners to child support. First, let me address the issue of visitation. The main purpose behind any visitation order, even for the non-consolidated parent, is to grant reasonable, liberal visitation that creates a strong parent-child relationship. Counsel, this is a case involving child custody. Aren't you required to so indicate when you file a brief to the court to alert this court and the clerk that this is a child custody case and can't be handled routinely since it's got to be expedited? I apologize, Your Honors. I should have, on the cover page, included that caption on the top of that. I did note that the docketing schedule in this matter did include those correct dates and the correct times. I hope that the parties and the court, and I also called the clerk's office to confirm that it wasn't an expedited schedule. I was informed that the judges were fully aware of that. I do apologize for that inconsistency and caught that after the brief was filed. I apologize to the court for that, and it won't happen in the future. In regard to that visitation issue, I would first look to the Dobie case. I know Dobie has been cited time and again as one involving the preeminency of the parent-child relationship over that of a babysitter. I get that, and that's what normally a case is cited for. But there's another ruling that I think is just as important as Dobie. And that is that a trial court can fashion an order in such a way, taking in the parties' situations, taking in their work schedules, taking in where they live at, in order to fashion an order that creates that strong parent-child relationship. And thus you end up in a position of both parties having a strong relationship with that child. Mr. Cate, your client chose to move to the state of Alabama away from the child. Correct, Your Honor. And your client didn't see the child the way I understand it except for one time during the first five years of the child's life. Correct, Your Honor. If I could address both those issues. The first is that he definitely did move from the Springfield Central area. He had a non-competition agreement which required him to leave this area initially. What was the circumference of the non-competition? I don't know the exact mileage of that. Obviously it was closer, I believe, than Alabama would be my assumption. I'm making that assumption. I think that's pretty obvious that he probably wasn't required to go to Alabama. And again, I would stress that it was a regrettable decision. He regrets having not been involved in her life. But at the same time, the Court of the College of Law can't use that as a form of punishment. When it's later sent out its visitation order, it can't set it out. It can't say, well, you know what, you haven't been involved, so I'm not going to give you that normal, liberal visitation schedule. I'm going to give you much less than that. But if the father is a stranger to the child? Right, and I would agree that there should be an entry period that should happen. But that's already happened. I think the trial court was clear on that. He's been involved for the last several years. It had that build-up period. And this was the time that he was supposed to be getting his more normal, reasonable visitation, which, again, on the side of the Dolby case, I think the court set it out as an acknowledgment. There is kind of a standard, routine, knee-jerk reaction of every other weekend, several weeks in the summer, split the holidays. And I know that every trial court would enter a different order as to that, but that's sort of a knee-jerk reaction, especially in the Central Illinois area, that that's kind of a visitation order that can happen. But it can't work in this particular case because of that distance, because of that. So I think what counsel had argued back, that, you know what, there's no cases out there that say the court has to extend summer visitation. That's correct. I think the takeaway from all the cases is that a trial court needs to create a schedule that gets that frequent, liberal visitation. I mean, if you work out the days, he's basically going to be an absentee filer 85 percent of the time. He'd simply like to be closer to the one-third that would normally happen in your typical standard visitation schedule. And if that means getting several weeks during the summer, then that's what that means. I mean, counsel has pointed out that there's several complaints with that. He's not an antipresent. I understand that. But that's sort of a red herring because both parties work. There's going to be some time in the summer that someone else is going to have to take care of Maya, so that's kind of an equal, that's kind of a draw on that particular issue. There's also that Robert wasn't present at the birth or those first early years of her life. Again, that's a punishment type of argument, that, you know what, we're going to use this as a punishment. You weren't involved early on, so I'm not going to give you that now. I truly did not get the sense that Judge Childress was punishing your client. I think he was trying to devise a visitation order that was in the best interest of the child. You know, from my take on reading what he said in his comments, I never got that impression. Was there something? No, I don't believe, I'm not trying to say punishment in that sense, but I think that's what was argued before was to try to keep coming up with that issue. I'm not saying it was directly reflected in Judge Childress's comments or anything of that nature, but if we're trying to use that as an argument as to why he should be more limited and bringing up this failure to be there at the birth, I don't think that's an appropriate argument. I'm simply trying to address that in that sense. I don't believe it's anywhere in Judge Childress's argument in his notes or anything of that nature that I saw also. The problem I see with this case is the contentions you make are entirely reasonable, and I'm sure you made them to the trial court as well. But the problem is that for us to conclude that the trial court erred here, we have to reach what in my judgment is the most deferential situation. Namely, we have to conclude despite the deference to be shown to the trial court that the decision was an unreasonable one. No reasonable person seated as Judge Childress in this case after hearing this evidence could conclude that the recitation he reached is appropriate. And let me just add there's a lot of situations where we have to give deferential review, but I think in the case of child custody and child visitation it's at its highest because there is a dynamic that occurs in a courtroom that you see and hear when you're the trial judge, as I have had occasion to be, where the record doesn't begin to convey it. Given all that, how can we conclude on this record no reasonable person could have taken this position? Two things that I might judge. First, I didn't handle this matter at the trial court level, so I just wanted to make that sense, but I don't know necessarily what should have been emphasized more. I have my own critiques of that. But I think we can look at the record, even looking at the bare numbers, which I think this court did in Doby similarly, and looking at how much he's actually going to be able to facilitate those actual visits with the child throughout the year and then throughout the summer, and where we end up at the end of the day, any reasonable person looking at that, when you've created a situation that basically Robert Mason is going to be able to be a dad 49 to 58 days out of the year, as compared to normally it would be 121 to 126, and that's on the low side, that I think you could say, Judge, that that is an abuse of discretion. I'm a trial judge. I'm looking at this guy who's got real deep pockets. Say, Dr. Mason, you want to see this kid more often? Come up to Springfield and spend more of your time up here. Right. I think you'd like to do that, but just simply in Alabama, Judge. I think you'd like to have her be able to have that relationship with him. Why can't I, as a trial judge, think of that? You know, as opposed to a guy who's driving a truck, Dr. Mason's got lots of money. He can come up here and get himself situated very comfortably and be up here. I take it there's no problem with visitation if he's here in town, is there? Judge, I think that's something else the trial court could have done. That wasn't allowed. Was he asked to do that? I mean, if he says, okay, gee, if I can't have summer vacation, how about I'll just come on up at my own dime, and I'll be up there lots of weekends? In that particular hypothetical, Judge, I think he might jump all over it if he was given a set time that they, because the parties couldn't agree. Did he ask? Did he ask for that? I believe that, Judge, I do believe that the record is clear that they tried to work it out themselves. Counsel, was that request made to the trial judge? I don't know that it was, Judge. I don't see any evidence of it. But if I'm the trial judge, why can't I consider that as an option that would be available to him today? Except that this order has already been entered granting certain limited times. So I think the trial court could have definitely done that. Well, that's going down to Alabama and taking the child away from the mother. Understood. As opposed to if you're here in town, let's just have normal visitation. I think that's correct. I think that's something else the trial court could have looked to doing when you have a situation where Dr. Mason is asking for 12 weeks or whatever he was asking for initially, but simply wanted more summer visitation. Definitely the trial court could have taken that into consideration. It didn't, though, or it didn't give that as an option. It never mentioned saying, hey, we're going to do several weeks down there and several weeks up here. I've been a trial judge, Counsel. Understood. It's not my job to come up with alternatives. Right. It's the litigant's job to say, here's what we want, and if we can't have that, how about this as an alternative? I don't see that that was necessarily raised at the trial court level. Okay. So it's all or nothing, says Dr. Mason, and the judge says, no, this is what you're going to get, and that's going to be it. I would respectfully disagree that it was an all or nothing, at least from Dr. Mason's point of view. I think he was relying on his trial counsel, which I know he's been stuck with, but at that same time, I don't know that he had an all or nothing point of view. I think he simply wanted more than he was ultimately able to receive into the trial court. I know that isn't the standard, but looking at it as Your Honors must do, I know I'm asking all of you to look up raw numbers. I think looking at raw numbers, it is an abuse of discretion, and Judge Steinman raised a great issue. Could they have done something which fashions more of a time up here in Sangamon County rather than there? I think the trial court could have done that. No, no, trial courts aren't going to do that. It's not a thing. Yes. So is spontaneous court supposed to do that? I think at different times trial courts do all sorts of good things to make liberal visitation between the non-custodial parent and the child so that it furthers that relationship. I think that can happen. I think there's a lot of good judges that do that. But it was not his responsibility to do so, I realize. In regard to the second issue on appeal, that of child support that was set, two things on that. Obviously, Dr. Mason acknowledges and fully understands he would be paying more child support if he was prepared to pay more child support when he brought the motion for increasing the visitation of which he had. So he knows that right out of the gate he was going to be increased from what he was previously agreed upon amount between the two parties. At the same time, we acknowledge that the default rule, use the guidelines. Use those guidelines. It's Dr. Mason's job to rebut those. Otherwise, the trial court can just use the guidelines, accept that he has rebutted that presumption. In this case, I would argue he did rebut that presumption and that it was an abuse of discretion by the trial court to not deviate in this matter and to simply adopt Kelly's figures as to how the child support should be set out. Now, the different factors that we look to, for example, financial resources and needs of the child, Graham and Bush, I believe both of those cases are still good law. I think that counsel had argued that these cases were decided over 20 years ago. What's their applicability today? I would agree. The numbers you can't use. Obviously, you can't say the numbers back in the 1980s are the same as the numbers now. But I would argue the different factors looked to in those cases should still be done today. It's a very fact-specific analysis which must be done when you have high-income earners to do two things. I mean, counsel is completely and entirely correct that the child support does not have to be set at what have already been shown as the needs of the child. So you're not stuck at that level. You can also show the future needs of this child also. But what's always been left off of that is the second side of that coin. Singletary in other cases, the second side of that coin is so it doesn't create a windfall to the child or to the unit. What about the lifestyle the child would have had? Absolutely. Yes, that should be definitely taken into account. That's one of the things that needs to be taken into account is what would this child's lifestyle have been. So let's look at Maya's lifestyle right now. Maya is a well-adjusted, smart little kid who, as shown in Appley's brief, is involved in tons of activities. I mean, she's in tons of different things. It's hard to imagine what else she's going to become involved in. She should be able to live at a minimal level. I understand that. But at that same token, it's the same time the case law shows that it shouldn't be providing an extravagant lifestyle for the child. If the child support was set, 60,000… Is there any evidence of extravagant lifestyle or a windfall? No, there's not, and there wouldn't be because there wasn't any. At the time of the trial, he had been paying the previous order of support, and so there wouldn't have the ability to show anything like that. I mean, they'd show that, oh, my gosh, there's an extravagant lifestyle. Wasn't he paying child support? Yes, he was, Judge. Well, how much was he paying before… He was paying $700 a month in child support. He also owed $200 for rearage, so they have a $900 calculation per month in support. That was reset to over $5,000 a month. Why was it only $700 to begin with? That was an agreement between the two parties. At what stage was that? That was early on after the birth of Maya. There was an order of parentage, and then there was an agreed-upon… There was litigation. Don't get me wrong. There was some litigation between the parties and disagreement, but I believe that was an agreed-upon situation. Was he already a practicing physician then? Not at the level… I believe he was finishing up the schooling, and then there was different issues there. And he definitely was… He may have already been at Springfield Clinic at that point, at one point there. So there was that issue of… He wasn't earning what he's earning now. No, he's definitely earning more money. He's definitely earning more money now. So what's to happen with this additional $5,300 a month? Pardon me, Judge? What's to happen with $4,300 a month more in support than was being paid? Where does that go? Well, all the support should go for the benefit and betterment of Maya. So that's where the problem lies, Judge. Well, you argued that you couldn't put on any evidence of extravagance because it hadn't been paid yet. It hadn't been paid yet, so there wasn't that extravagance. Also, does that flip the burden over to them to show what they were going to do with the additional $4,300? I think that is one of the factors, Judge, definitely. I think that goes into the last one, physical, emotional condition of the child and educational needs. It's kind of like the last catch-all factor. Does this child have high income earners? It says, hey, maybe you can, maybe you don't need to do this. Maybe you can make up more if this child has certain special issues. Well, there's a replied brief of what is more telling is that at the trial court level, Kelly provided no analysis to the trial court of how $60,000 would be spent, all for the betterment of Maya. Right. I guess I'm asking, does the case law say that Kelly had to present evidence of that nature? No, it does not. It doesn't say you have to show that extravagance. But it does show, I think you'd have to show what the physical, emotional condition of the child is such and the needs of that child that show where it's going to need to be up there. When he's trying to rebut the presumption, I think they would respond back and say, oh, heck no, she has those special issues. It's not going to be a windfall, Judge, to the trial court. It's not going to be a windfall because we have these that take it up there. So we don't have that in this case. We have a case in which we're actually, Robert Mason is paying $12,000 over the entire household expenses of Kelly. It's difficult to imagine a situation in which that doesn't create a windfall. You have a $60,000 child support on one child and two other children receiving, Kelly not with Dr. Mason, receiving $700 a month of child support for those two kids. I mean, the logic presented by that is that obviously the money won't all be spent on the betterment of that child. And Dr. Mason doesn't have any basis to have to support either Kelly or those other two children. So where should it have been set? Pardon me, Judge? Where should the support be set? Less. Help me out a little bit. I understand. Judge, I think if you could take a situation in which Kelly's financial affidavit shows all the expenses in regard to Maya, take all those together, you could then double those expenses, and you end up around a $2,500 to $3,000 range. You've taken a situation in which all of her known expenses are here, and then we double it on top of that. To help go into Judge Pope's situation, what about the unshown or the future? Could the trial court or this court consider the fact that from the point of view of Robert Mason, it's a chump change? Judge, I'm out of time. Can I respond? Please. Judge, I don't know that he made that situation. I don't think he made it known, at least in his record, in the sense of saying, I think it's a situation. Could it be considered that? And can this court consider that fact in deciding whether we need to conclude that the determination that there's a statutory figure that should be adhered to, which is what we're talking about, that the amount of money involved is chump change to Dr. Mason? I think the trial court was fully aware of the amount that was setting out. How about this court? Do you believe it would be an abuse of discretion? I think the judge would abuse his discretion in not looking at all the factors and then deciding whether or not he should deviate in that basis. I think that would have been an abuse of discretion, Judge. To simply say that he's a high number. I can answer my question. I'm sorry. Is it appropriate for the trial court to consider, and for this court to consider, that the amount of money in question is chump change to your claim? I think your honors could definitely consider the amount involved. I don't believe it would be, but at the same token, I don't believe it would be appropriate or I don't believe it would be consistent with the precedent set down by this court. Thank you. Thank you. You'll have the time to rebuttal. Ms. Asher? Thank you. May it please the court, counsel, my name is Jennifer Asher and I represent the petitioner of Kelly, Kelly Deguano. For purposes of ease in my briefs, I refer to the parties as Rob and Kelly, and I mean no disrespect, so I'll do that here today. Just so the record's clear, the party's daughter is Mia. She's now eight years old, and she has lived with my client the entire time. I'll just touch very briefly on visitation. This has never been a question about restriction or serious endangerment, which is a requirement under Section 607 of the Illinois Marriage and Dissolution of Marriage Act. This has always been a case about what is reasonable visitation. The trial court had all the facts, heard the party's testimony, saw exhibits, relied on those facts in fashioning an award of three weeks, 21 days, of summer visitation. The trial court did not abuse its discretion in awarding this amount of visitation. The only issue I'd like to address, raised by Mr. Cate, is when he talks about the raw numbers. His raw numbers are flawed, and they're flawed for a variety of reasons. First of all, the order entered into, the consent order, the agreement entered into between the parties, permits Rob to have one weekend per month, and it's not a two-day weekend. It can be from a Thursday to a Tuesday, presuming that Mia doesn't have school. Arguably, there's not that long of a weekend, one time a month, with every school calendar. But certainly, most months, there are three-day weekends. So this 48 days, 50 days, that's a misnomer. That doesn't exist. There are many times in the month when Dr. Mason will, in fact, have a three-day weekend every single month with Mia. He gets every single spring break, pursuant to this consent order. He gets Father's Day. He gets at least half a Christmas break every single year, as well as Easter visitation time. The trial court did not abuse its discretion in awarding Dr. Mason three weeks of summer visitation. The next issue I'd like to address is downward deviation. As stated by Mr. Cate, Section 505 requires the statutory calculations of child support, unless the petitioning party presents evidence that child support should be deviated downward. What do you think of counsel's argument that, what if you take all the known expenses of the child, double that, give that in support, why wouldn't that be fair? Judge, that wouldn't be fair for, I can think of two good reasons. First of all, case law is clear that a child's needs and household expenses are oftentimes tied to the level of support. Although Kelly's expenses exceeded her income every month at the time of trial by approximately $700, she wasn't in a position where she could spend upwards of $5,000 a month for her household or for Mia. She wasn't living extravagantly because she didn't have the income coming in. So that's not a fair analysis to make. Sure, her needs and household expenses at the time were in line with the income coming in, as most financially responsible people live their lives. I think the other flip side of that is that we look at when Dr. Mason started earning this amount of income. He partnered with iHealth Partners in approximately March of 2008. iHealth Partners is an organization that provides the facilities, the staff, negotiates with managed care for Dr. Mason, provides his equipment, provides his medications for his patients. From March of 2008 until December of 2008, when Dr. Mason was starting up his practice and getting going, he grossed, when I say he, there's a big distinction, he has a PC, professional corporation, he's the sole owner and sole shareholder. And the trial court essentially found that they were one in the same, that all the money flows through the PC. But the PC grossed approximately $420,000. After iHealth Partners took its cut, Dr. Mason's $1099 reflected approximately $280,000. That's from March of 2008 until December of 2008 when he was starting his practice. In July of 2009, he hit his trigger event with iHealth Partners. And what that meant was he was making enough money with iHealth Partners that 52% of his net cash receipts went to iHealth Partners and he maintained the rest. What's a net cash receipt? Essentially, any expenses, so the gross amount that comes in and then any expenses associated with, you know, they had a contract that was approximately 20 to 30 pages long that came into evidence. But certain expenses would come out that the PC would have to pay and those would come off the top. So iHealth Partners wouldn't be entitled to that. But the net cash receipt in actuality was very close to the amount actually grossed by the Mason PC. And in July, so prior to July of 2009, he was, for lack of a better word, salary. iHealth Partners loaned him enough money so that he could have a certain salary each month, which equaled approximately $280,000 a year. In 2009, his monthly income was such that he no longer needed to rely on these loans from iHealth Partners. He took 48% of his net cash receipts at the end of the day. And in 2009, again, he just started this practice in March of 2008, he had grossed in excess of a million dollars. And that increase is pretty substantial. His 1099 income for 2009 was over $520,000. So we get back to the question of, you know, is it fair to award more child support than the household expenses that exist for Kelly? Kelly's household expenses at the time of trial were approximately $4,300. Dr. Mason's household expenses at the time of trial, at the time that he's earning $520,000 a year, are in excess of $12,000. And he has a household of one, Kelly has a household of one. Monthly. Monthly living expenses on his financial affidavit total in excess of $12,000. What did that include? That included things such as lawn care services at $337 a month, computer services at $146 a month, eating out expenses, I believe, over $1,000 a month. Just a variety of expenses. So when we look at the monthly, I guess it kind of goes back into the question of how, the real question I think oftentimes is, the query is, how much is too much? Is $5,000 too much for Mia? And the answer to that is Mia's father earns $520,000 a year. He grosses, if you do the math, grosses $43,000 per month. Kelly works for Hope Institute as a training specialist. She grosses, in 2009, $34,000 a year. Rob's grossing $9,000 a month more than Kelly grossed the whole year. Mia's entitled to this standard of living had her parents been together. Had her parents been together, she would live in a household that grosses approximately $550,000 a year. I think the other thing, the concept that goes along with statutory support is that Dr. Mason is paying 20% of his income. So at the end of the day, he still has 80% of his net income left over to pay his $12,000 a month in living expenses to contribute to his retirement account to fund a life insurance policy. My client, on the other hand, at the time she was receiving $900 in support, had $5,000 in retirement accounts, couldn't fund a life insurance policy. Her resources are completely, at the time of trial, utilized for purposes of supporting her household. But the doctor has no obligation to help her fund her retirement. You're not arguing that, are you? Absolutely not arguing that, Justice. I'm just arguing that she should have the ability to use a portion of her income that she earns for purposes of funding her retirement, similar to Dr. Mason's ability to fund her retirement. She didn't have that ability when she was awarded $9,000 a month. At trial, Dr. Mason testified that he should pay $1,000 a month because it seems pretty fair, and it's one in the third times more than Mia's siblings got, so that seemed pretty fair. That was his testimony. It's not about what's fair. It's about the statutory guidelines. He has a duty to support Mia at that obligation. And this case is very distinct from the Graham case. The Graham case is the case that was remanded back because the trial court found that it should be a deviation downward because a support award of $1,600 a month would support the entire family. In Graham, the mother had two children. She was pregnant again. Her only other source of income was public aid benefits. So an award of $1,600 would completely wipe out any state assistance, and $1,600 truly would support that mother's household. Now, the appellate court didn't say the trial court doesn't need to deviate, should not have deviated downward. The appellate court just remanded back and said, you need to consider all of the statutory factors under 50582. In this case, Kelly received $600 per month for support of her two other children. In addition, she works. She has an income coming to support her household. Dr. Mason is not supporting this household in and of himself. There are other sources of income coming in to support Kelly's household. Is there any limit as to how much would be paid pursuant to the statutory amount where the court could say, no, this is just excessive? His income were $15 million instead of $1.5 or whatever? Judge, I don't think there is. $500,000 or whatever? Justice, I don't think there is. The Keon case, of course, is a key case in the Fourth District. The trial court in that case deviated downward from $12,000 to $8,500 per month, certainly more than my client is receiving. So, no. Is there any case law that says how much is too much? No.  Some people are born into families whose parents earn substantial incomes. Some people aren't. Mia happens to be the child of a physician who earns a very large income. She should be entitled to have a similar standard of living at her mother's house as she does at her father's house. I think counsel is basically saying it's unrealistic or against common sense to think that the additional $4,300 a month is going to be spent only for Mia. What say you to that? Judge, again, I would argue that there are other sources of income coming in. And case law in Illinois, we're not a state that has to account for where the trial court is going. There's no requirement that Kelly outlines that she's spending the money on school and new shoes and new outfits and dance outfits. It comes down to a standard of living. And Mia with Kelly- Well, here you've got two other kids that aren't his. Does she need to, because she's getting so much support from Mia, does she need to make certain that Mia has a higher standard of living than the other two kids? Case law has said that that absolutely should not happen. That children should not live in a household where one child is dressed nicer and one child is living a different standard of living than other children in the same household. So certainly- So then he's right. The additional support does go towards the standard of living of the two children who are not his. I don't think it goes towards the children, Justice. I think it goes towards the household expenses. And what the appellate courts have said is that there shouldn't- certainly there's not going to be- children shouldn't live in a household where they're treated differently. That goes against the social norms and everything. So could we provide an accounting of Kelly having to put Rob's child support in one account and just use that money on Mia? Sure, that could be the law of this state, but it's not. So I guess does he- is it possible that certain dollars will be taken from a joint account and new shoes will be bought for Evan or be bought for Carter? Could that happen? Sure, it could happen. But it all goes back to Dr. Mason continuing to live in a household with- at the end of the day, if you take his payment of child support, he still has in excess of $20,000 a month for his living- net income, $20,000 per month. Kelly's salary, Kelly's child support from her previous- for Carter and Evan, and the child support award of $5,000 put Kelly at a net income at the end of the month of approximately $7,000. So Dr. Mason, for his household of one, still continues to almost have nearly three times as much available income for his purposes. And I think that's what outweighs the factor that this money could be used for incidentals for the other children. Sure, it could, but we're still looking at Mia's standard of living. Mia's entitled to this standard of living. I think a good example of this is for Mia's whole life, the first time she went on an airplane- because it's the first time her mom could afford it- was when Dr. Mason flew Kelly and Mia to Alabama for the first visit. He flew them both down, and that was both of their first airplane rides. Kelly has done things- she travels and she exposes Mia as much as possible, but they travel to a home in Michigan that's owned by her family to save on expenses. That's their summer vacation every year. And there's nothing that should prevent Mia from having and enjoying the luxuries that her father enjoys. The next argument I would like to address is the calculation of child support. Mr. Case suggests in his brief that the court, taking away the whole concept of downward deviation, child support wasn't calculated properly because Dr. Mason's student loan payments were not deducted from his support obligation. The Fifth District in Roper v. Johns has held that it is discretionary for a trial court to decide whether or not to permit that deduction. In this case, the trial court had the following facts. Dr. Mason has student loans that still exist of approximately $100,000. However, Dr. Mason also has deposit accounts that could easily satisfy those loans. At the time of trial, the checking account of his PC, of his professional corporation, was in excess of $120,000. Right at the time of trial, his professional corporation purchased a new piece of equipment, paid for it outright, a $74,000. And the trial court was able to take those factors into consideration when determining it was not appropriate to allow the student loan deduction. I think it's also important to point out if we do put that student loan deduction into the calculation, it reduces the child support award by $155 a month. The equipment also should not, is also not appropriate. Well, you're not conceding it should be reduced by $155 a month. I'm not, Justice. I'm just indicating that if it were, it would be by approximately $155. We're talking a very small amount in comparison to the award of support. Similarly, the equipment under 505A3 is required to be a repayment of debt for an expense incurred that is necessary and reasonable. This piece of equipment, the CEO of iHealth Partners said, we provide all equipment. We do a risk, or we do an asset allocation, and we decide, is the equipment necessary to provide the highest standard of care for our patients? And when Dr. Mason asked to purchase this particular piece of equipment, the CEO said, no. You don't need it. You can provide care to your patients without it. He determined that he wanted to buy it anyway. The CEO testified it's highly unusual for a physician to do that. Further, he's not repaying any debt on it, so there's no deduction that should come off the child support calculation for that purpose. The last issue I'd like to address is the issue of attorney's fees. I think it's interesting and somewhat telling in Rob's brief in the attorney's fee section, he notes that the trial court was clearly aware of all the financial resources of the parties at issue, having received countless exhibits and hours of testimony. I think the same applies to the child support calculation, which again, we're looking at an abuse of discretion. The trial court did not abuse its discretion in determining not to deviate downward. However, with respect to attorney's fees, the trial court did abuse its discretion. And the reason that the trial court abused its discretion, it offered no reasoning or no opinion as to where it came up with an award of $7,500 for attorney's fees. Interestingly, during the trial, there was an arrearage calculation. Rob's counsel made an argument for court insatisfaction for some of the arrearage payments that had happened back in 2004. And Rob, when testifying, questioned by his counsel, said, I think I should pay $7,500 in arrears. That seems fair and equitable, and I have that much money. That's the amount of attorney's fees that ends up being awarded to my client. And when we look at the award of attorney's fees, two factors we have to consider. Does the party have the ability to pay? And does my client not have the ability to pay? I won't go through again how we know that Dr. Mason has the ability to pay. 2009, he earns $520,000. He inherits $168,000 from his father. He pays his attorney, testifies, can't remember exactly how much, but definitely he paid his attorney in excess of $60,000 until the time of trial in May of 2009. My client, on the other hand, at the time of trial, had paid my firm $1,500. She had attorney's fees less than half of what Rob had incurred of $28,000. An award of $7,500 leaves approximately $21,000 left for Kelly to pay my firm. Kelly has $5,000 in retirement. She rented a home at the time of trial. She drove a 2004 minivan. She doesn't have the resources available to pay this. The only resource she will have available to pay her attorney's fees would be the support she would receive for the benefit of Mia. And it's not equitable or just for the trial court to essentially have Kelly earmark those funds for purposes of attorney's fees. In conclusion, Dr. Mason clearly has the funds available to pay. The In Re Marriage of Davis case has indicated, an appellate court has ruled that periodic payments are fine. Dr. Mason doesn't have to be ordered to satisfy my fees all in one payment. He can make periodic payments to satisfy the balance. He clearly has the ability to pay. My client does not have the ability to pay. These are all decided by the trial court at the same time, are they not? All the issues, yes. Why couldn't the trial court have reasonably considered the denial of Dr. Mason's request to deviate from the statutory guidelines along with the fact that you're not going to get everything you wanted by way of attorney fees and just kind of balance it out? That's absolutely what the trial court could have done, Justice. We should say no reasonable person could have reached that decision? No reasonable person could have reached the conclusion that an individual earning $520,000 and paying his attorney $60,000 should only have to pay someone who earns $34,000 a year, $7,500 in attorney's fees. That would be our argument. Thank you. Thank you, counsel. Rebuttal, please. Thank you, Your Honor. First, I'd like to start with the college education deduction. I know that's a minor issue, and I acknowledge that in the sense of the calculation of it. The reason that's in there, though, also is just to highlight the fact that the trial court simply adopted Kelly's figures. It's basically his order was word for word, her exhibit. Of course, if they're correct, then there's no problem with the courts doing so, is there? Sure, but as we've been discussing, it was an abuse of discretion. I understand. I was simply trying to use it as a highlight of that the trial court wasn't doing its own analysis. In the cases that are cleared, the trial court shouldn't punt to the attorneys in that sense. There always should be that sit back and look at it and do your own analysis because, gosh darn it, attorneys are going to be advocates for their clients and going to skew factors in certain ways, and they need to double check those things. College expense is one of those. The purchase of equipment being another. Counsel, all I can say is I hope the statute of limitations is run on the time I was a trial judge because I think I must have, in these kinds of cases, at least half the time been persuaded by and adopted one party's figures or another's because I found them to be compelling and accurate. Sure, I understand. Does that mean that there's a presumption that I just abandoned my judicial road to decide with whom I agree? Absolutely not, Judge. I'm sure that you still reviewed those factors and made sure everything was included. Why didn't Judge Childress? Well, I think that's why I was including the colleges here because I think it's pretty much an easy one to look at to say the court would say that gets deducted. I mean, it's not. I used the example of it. Sure, it doesn't get deducted if the guy is selling used cars and he has these degrees. Absolutely, he shouldn't get it, but he should get it for this, and it's a minor issue. I'm just trying to highlight that the court didn't do the analysis for deviation because I think we'd all end up at a place where it would be deviated lower. And I know Justice Turner wanted me to put me on the spot of a certain number, and I gave it to my best ability, but I'm not saying it had to be deviated to that number. I'm saying that deviation would be appropriate, and the trial court wasn't doing the analysis. It was simply punting it up and going, Mason, adopt it. You can tell it's figures. Counsel, before you run out of time here, just to shift gears, assuming visitation works out well, can't the trial court increase the amount of time that was awarded here? It could. I don't want to make sure that we're not running into a situation where we would have to wait two years in which to look at it again. I don't believe we'd be in that type of a situation. I think Dr. Mason could petition the court and say, hey, this is working out well. Assuming like before, though, it won't be agreed to, so it's not going to be something that can work out between the parties, and we're right back to the same accounting circuit court to then argue again. We should have more visitation time. It wouldn't be hard for the judge to say, you know what? I did this before. The last year, guys, you litigated the heck out of it. Too bad. You're stuck. Working out well or not. I think it's too often the trial courts seem to have just heard the issue. And just very briefly on the issue of the attorney's fees, as I've been discussing throughout, one issue that the trial court did get correct was the issue of attorney's fees. It's amazing how that worked out. I think we're all surprised that I feel that way. No, but I think the point on that one is, and I agree with counsel, the ability to pay is a key issue. The point before then, always, every time there's an award of attorney's fees, there's a reasonableness factor. And I think the judge even said that in one spot in there, that the parties have kind of scorched earth, had a scorched earth position on certain issues, and I think that the first thing that was taken into consideration was the reasonableness of the party's position. I think the trial court was free to do so in that. And absolutely, did Dr. Mason pay a ton of attorney's fees? Yeah. Was he ripped off like heck, I would argue, to this court? In that sense, it shouldn't be. That shouldn't be that Dr. Mason paid a whole bunch of attorney's fees. It shouldn't be an analysis of why the trial court was required to order more to Kelly in that particular instance. And if I might have one second more, I was hoping to discuss Keon's case fairly briefly, because it was the most recent decision in that sense. Keep in mind, Keon is consistent. Part of its analysis is a little bit tortured to kind of knock Graham out of the way, I would argue. But that position is such that they had already deviated below. So that court already went through each of those factors in the appellate court, then looked at it and said, okay, wait, trial court, you did go through each one and found out how each one is. So we're not going to reverse. We're not going to do deviation as appropriate in that case. Because remember, Keon wanted to deviate even more. So when you look at the percentages, actually Dr. Mason paid a greater percentage than the NBA basketball player for the Chicago Bulls at the time. Dr. Mason is actually paying more on a percentage basis for an actual net income, too. The future looks brighter for Dr. Mason. True, true. Although, keep in mind, Judge Marskoff, in her opinion in that one, said, look how bright the future is going to be in that particular case. Well, as sharp as she is, she might have misassessed that situation. Right. And that's where I point to the Justice Cook dissent, which was very well written, I would argue, in the sense of he was talking about the issue of the overage or the windfall that would take place. Thank you. I'm out of time. Thanks to both of you. The case is submitted. The court stands adjourned.